2012 Ark. 87

**Thomas Leo SPRINGS, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CR 09–824.**

Supreme Court of Arkansas.

March 1, 2012.

Rehearing Denied May 3, 2012.

Jeffrey Marx Rosenzweig, Little Rock, for appellant.

Dustin McDaniel, Atty. Gen., Karen Virginia Wallace, Little Rock, for appellee.

DONALD L. CORBIN, Associate Justice.

⌊₁Appellant Thomas Leo Springs appeals the decision of the Sebastian County Circuit Court denying his petition for postconviction relief filed pursuant to Ark. R.Crim. P. 37.5 (2011). On appeal, Appellant alleges that his trial counsel was ineffective in failing to (1) interview or call his son as a mitigation witness during sentencing; (2) object to improper closing argu-

ment by the State; (3) properly handle the admission of an aggravating circumstance; (4) object to the admission of written victim-impact statements; (5) properly conduct voir dire; and (6) sufficiently explain his right to present uncomplimentary evidence about the victim during the penalty phase. We affirm.

On January 21, 2005, Appellant rammed his car head-on into a car in which his estranged wife, Christina Springs, was a passenger. Her sister, Kelly Repking, was driving the vehicle, and her three-year-old niece, Paige Garner, was also a passenger. After hitting the Repking vehicle, Appellant got out of his car, shattered the passenger-side window of the Repking vehicle, and began beating Christina's face into the dashboard. He stopped and returned to his vehicle, where he retrieved a knife that he used to then stab Christina multiple times. Christina died as a result of the injuries inflicted by Appellant.

Appellant was charged with capital murder, pursuant to Ark.Code Ann. § 5–10–101, and two counts of aggravated assault, pursuant to Ark.Code Ann. § 5–13–204. He was convicted of all three charges, and sentenced to death on the murder charge and six years' imprisonment and a $10,000 fine on each of the assault charges. This court affirmed his convictions and sentences in *Springs v. State*, 368 Ark. 256, 244 S.W.3d 683 (2006).

Thereafter, Appellant filed a timely petition for postconviction relief, as well as an amended petition, setting forth the allegations now raised on appeal.[1] A hearing on the petitions was held on April 30, 2009, at which Appellant, his trial counsel, John Joplin and Cash Haaser, as well as Appellant's son, Matthew Mooring, testified.

The circuit court entered an order on June 10, 2009, denying Appellant's request for postconviction relief. This appeal followed.

This court has held that it will reverse the circuit court's decision granting or denying postconviction relief only when that decision is clearly erroneous. *See Williams v. State*, 369 Ark. 104, 251 S.W.3d 290 (2007); *Howard v. State*, 367 Ark. 18, 238 S.W.3d 24 (2006). This court has said, "A finding is clearly erroneous when, although there is evidence to support it, the appellate court, after reviewing the entire evidence, is left with the definite and firm conviction that a mistake has been committed." *Williams*, 369 Ark. at 107, 251 S.W.3d at 292 (quoting *Howard*, 367 Ark. at 26, 238 S.W.3d at 31).

When considering an appeal from a circuit court's denial of a Rule 37 petition, the sole question presented is whether, based on a totality of the evidence under the standard set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the circuit court clearly erred in holding that counsel's performance was not ineffective. *Anderson v. State*, 2011 Ark. 488, 385 S.W.3d 783; *Sparkman v. State*, 373 Ark. 45, 281 S.W.3d 277 (2008). In making a determination of ineffective assistance of counsel, the totality of the evidence must be considered. *Howard*, 367 Ark. 18, 238 S.W.3d 24.

The benchmark for judging a claim of ineffective assistance of counsel must be "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be

---

1. There were additional allegations of error raised in his petition and amended petition that Appellant has not pursued on appeal and are deemed abandoned. *Jordan v. State*, 356 Ark. 248, 147 S.W.3d 691 (2004).

relied on as having produced a just result." *Strickland,* 466 U.S. at 686, 104 S.Ct. 2052. Pursuant to *Strickland,* we assess the effectiveness of counsel under a two-prong standard. First, a petitioner raising a claim of ineffective assistance must show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the petitioner by the Sixth Amendment to the United States Constitution. *Williams,* 369 Ark. 104, 251 S.W.3d 290. A court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.*

Second, the petitioner must show that counsel's deficient performance so prejudiced petitioner's defense that he was deprived of a fair trial. *Id.* A petitioner making an ineffective-assistance-of-counsel claim must show that his counsel's performance fell below an objective standard of reasonableness. *Abernathy v. State,* 2012 Ark. 59, 386 S.W.3d 477 (per curiam). The petitioner must show there is a reasonable probability that, but for counsel's errors, the fact-finder would have had a reasonable doubt respecting guilt, i.e., the decision reached would have been different absent the errors. *Howard,* 367 Ark. 18, 238 S.W.3d 24. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Id.* The language "the outcome of the trial," refers not only to the finding of guilt or innocence, but also to possible prejudice in sentencing. *Id.* Unless a petitioner makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversarial process that renders the result unreliable. *Id.* "[T]here is no reason for a court deciding an ineffective assistance claim ... to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052. With this standard in mind, we now turn to the issues raised by Appellant.

### I. *Failure to Investigate and Call Particular Mitigation Witness*

As his first point on appeal, Appellant argues that the circuit court erred in denying his request for relief based on his assertion that counsel were ineffective in failing to interview his son, Matthew Mooring, as a potential mitigation witness and in not calling him to testify during the penalty phase of his trial. Specifically, Appellant asserts that his son would have asked for mercy and testified to his father's positive characteristics and that this testimony could have balanced the testimony of his younger son presented by the State. The State counters that Appellant cannot demonstrate prejudice because Appellant presented testimony from fourteen mitigation witnesses, and anything Mooring stated would have been similar to evidence that had been introduced. Moreover, the State asserts that there was evidence it could have used to impeach Matthew's testimony that his father was generally a good dad and a good provider. The circuit court correctly denied relief on this claim.

In denying relief, the circuit court noted that Appellant called fourteen mitigation witnesses that testified, among other things, that Appellant was a loving father who was involved in his children's lives, that he was loved by his children, that he was a hard worker, good natured, and an honorable person. The circuit court found that the testimony that Matthew would have given was cumulative of much of the aforementioned testimony. Moreover, the court noted that any testimony about appropriate punishment would not have been admissible under this court's decision in

*Greene v. State,* 343 Ark. 526, 37 S.W.3d 579 (2001).

In *Coulter v. State,* 343 Ark. 22, 29, 31 S.W.3d 826, 830 (2000) (citations omitted), we explained as follows:

> The constitutional guarantee of effective assistance of counsel extends to the sentencing phase of the defendant's trial. Counsel's failure to investigate and present substantial mitigating evidence during the sentencing phase may constitute ineffective assistance of counsel. Counsel is obligated to conduct an investigation for the purpose of ascertaining mitigating evidence, and the failure to do so is error. Such error, however, does not automatically require reversal unless it is shown that, but for counsel's errors, there is a reasonable probability that the sentence would have been different. When reviewing a claim of ineffectiveness based upon failing to present adequate mitigating evidence, we must view the totality of the evidence—both that adduced at trial and that adduced in the postconviction proceeding.

Thus, it is undisputed that the guarantee of effective assistance of counsel clearly encompasses the penalty phase of a criminal trial, and this court has recognized that the failure to present any testimony during the mitigation phase of the trial fails to pass constitutional muster. *See, e.g., Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (holding trial counsel's failure to investigate and present substantial mitigation evidence during the sentencing phase can constitute ineffective assistance of counsel); *see also State v. Smith,* 368 Ark. 620, 249 S.W.3d 119 (2007). However, this court has further held that the decision not to offer certain mitigating evidence is a matter of trial strategy where the decision is made after a full investigation of the facts. *See Wooten v. State,* 351 Ark. 241, 91 S.W.3d 63 (2002).

Appellant cites us to the United States Supreme Court's decision in *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), to support his contention that counsel was ineffective in failing to interview and call Matthew as a mitigation witness and that prejudice resulted therefrom. In *Wiggins,* the defendant was convicted of murder and sentenced to death. During postconviction proceedings, the defendant claimed that counsel failed to investigate and present mitigating evidence of defendant's dysfunctional background, which included extreme physical and sexual abuse. *Id.* The defendant's trial counsel argued that, as a matter of trial tactics, he decided to focus on retrying the factual case instead of investigating and introducing mitigating evidence during the sentencing phase. *Id.* The Maryland Court of Appeals affirmed the trial court's denial of relief, holding that counsel's decision not to investigate was a matter of trial tactics. *Id.* The Supreme Court reversed, holding that "[g]iven both the nature and the extent of the abuse petitioner suffered, we find there to be a reasonable probability that a competent attorney, aware of this history, would have introduced it at sentencing in an admissible form." *Id.* at 535, 123 S.Ct. 2527.

Similarly, in *Sanford v. State,* 342 Ark. 22, 25 S.W.3d 414 (2000), we held that trial counsel's failure to investigate mitigating circumstances and present such evidence during the penalty phase constituted ineffective assistance of counsel. In *Sanford,* as in *Wiggins,* counsel conducted virtually no investigation regarding mitigation evidence. The potential mitigation evidence that petitioner argued should have been investigated and introduced included longstanding mental retardation, his age of sixteen at the time of the murder, medical

records of head injuries, a family history of mental retardation, and jail records reflecting commendations. In concluding that counsel was ineffective, this court stated that "it is only after a full investigation of all the mitigating circumstances that counsel can make an informed, tactical decision about which information would be the most helpful to the client's case." *Id.* at 33, 25 S.W.3d at 421–22 (quoting *Pickens v. Lockhart,* 714 F.2d 1455, 1467 (8th Cir.1983)). In *Pickens,* it was undisputed that counsel failed to make any investigation at all. The court in that case recognized that counsel

> may choose not to investigate all lines of defense and may concentrate, for reasons of sound strategy, on another possible line of defense. We would not fault such a strategy if it were a reasoned choice based on sound assumptions. That is not the situation here. Plant did no investigation into any possible mitigating evidence. He was left with no case to present. A total abdication of duty should never be viewed as permissible trial strategy.

*Pickens,* 714 F.2d at 1467 (citations omitted).

This case is distinguishable from *Wiggins, Sanford,* and *Pickens.* It is not a situation where counsel totally failed to investigate and put forth mitigation evidence. Here, counsel produced fourteen mitigation witnesses who testified about Appellant's general good character, his work ethic, and his love for and involvement with his children. The question then is whether counsel's failure to interview and call a particular witness, Appellant's son Matthew, rendered counsel ineffective and prejudiced Appellant such that there is a reasonable probability that the outcome of his trial would have been different. To correctly determine this issue, we must look at all the evidence adduced at trial and at the Rule 37 hearing. *Howard,* 367 Ark. 18, 238 S.W.3d 24.

At the hearing on his Rule 37 petition, Appellant presented testimony from his trial counsel, Joplin and Haaser. Joplin, who was responsible for the penalty phase of the trial, stated that he called a number of mitigation witnesses—people who had worked with Appellant, lived near him, and that type of thing. He stated that he was aware that Appellant had a number of children, one of whom testified for the State. He admitted that he did not try to contact any of Appellant's older children to determine if they would be willing to help during the penalty phase but that he should have done so. He admitted he probably discussed the issue with co-counsel Haaser, but could not recall a specific conversation. On cross-examination, Joplin stated that he was aware of Chantelle Mooring and Matthew Mooring, Appellant's two oldest children, but decided not to interview or call them as witnesses.

Matthew testified that no one from his father's defense team contacted him and, if he had been asked, he would have testified for his dad. When asked what his testimony would have been, Matthew stated the following:

> Well, he was a good man, you know, he had—everybody has faults and everyone makes mistakes, but, I mean, he is my dad and he is my sisters' dad and he is my brothers' dad and, you know, they had already lost one parent and, you know, him being alive gives them something to be, you know, they could write him, they can have something to keep up with and, you know, I wouldn't want them to lose their father and I wouldn't want to lose mine because then it feels like we have nobody.

Matthew also stated that he would have asked the jury for mercy and would have discussed his father's positive aspects. He

stated that he would have testified as follows:

> We never needed anything. We didn't need—we were never without a home, we were never without shelter, we were never without proper education, clothes for school, we never needed food, we never needed anything. He worked hard, he worked overtime, he did whatever he had to, to make sure that everybody in the family was taken care of.
>
> . . . .
>
> ... [A]nd he was really caring, too, you know, to the kids, to me. Whenever, you know, when he was on his good moments he was a great father.

Matthew stated that he made a statement to the court after the jury deliberated Appellant's sentence, but before formal sentencing, to the effect that his dad was a good dad and loved his children. Matthew stated that he would have made similar statements if called as a mitigation witness. Appellant now asserts that this testimony would have, in essence, counterbalanced the testimony of his younger son, Jacob Springs, who testified at sentencing on behalf of the State.

Jacob's statement, which he read to the jury, was as follows:

> I am 12 years old. I am in the 7th grade. My mother was Christina Springs. I would like the jury and the Judge to know how I feel about what happened to my mother. My life changed a lot because my dad killed my mom. It is hard to wake up in the morning because my mom isn't here to be by me. My Aunt Kelly is still there for me and my Aunt Ashley and my Aunt Brittany and my Aunt Laura and my Papa. I love them for that, but I miss my mom.
>
> Me and my brothers and sister don't live together any more because they all are in DHS because of what my dad did to my mom. I live with my Aunt Kelly and my Uncle Brian because they adopted me from DHS. I miss the way we used to be together. I loved my mom so much and I miss her.
>
> I have to live with what my dad did every day. She is gone from my life now. We used to talk a lot. She was a good friend. We used to talk about how when I grew up I was going to buy her a new car for her.
>
> She always came to see my school stuff and said she was proud of me. I miss her so much. I can't sleep at night because I look at mom's picture. I have to go to bed at 9:00 p.m. every night, but I stay up looking at my mom's picture until 2:00 and 3:00 in the morning because I feel it is my fault that she is gone. If she just didn't go to my school that morning, I feel we would be with her. I feel like I don't have anything to live for any more.
>
> When my dad killed my mom I didn't know how I was going to live without her. She was my life. When the police told me that my dad killed my mom I was so hurt inside my heart. I am on medicine now. I am not eating that much any more. I weighed 89 pounds when my dad killed my mom and now I weigh 87 pounds, but they put me on medicine so I can eat more and so I can feel happier because I was so sad and mad. My mom was loved by so many people. My dad took her away from our lives forever.
>
> Dad, I want you to know how you are so selfish to take her away. One day you said if you can't have her no one can have her. I didn't know you meant us kids, too. I just want to know why you killed my mom. Will you tell me when I grow up?

Every time I see my mom in that picture in the newspaper it makes me so sad and I just feel so mad. I have to live with it every day of my life. Now I go to school called Perspectives day school where I get daily therapy. I don't really want to be there, but at Ramsey I was having a hard time.

Me and my mom did lots of stuff together. We went to the store, the mall, and the car wash and to Wal–Mart. We played around a lot together. It was so much fun when she was alive. All I have to remember her by is pictures, her grave and a statue called Angel of Grief at the Crisis Center. My mom will never be forgotten. If I could have one wish in the whole wide world it would be for my mom to come back.

While we believe counsel was ineffective in not interviewing Appellant's other children and not calling Matthew to testify as a mitigation witness, we cannot say that prejudice resulted therefrom, such that there is a reasonable probability that the jury would have imposed a different sentence. First, the two statements are not even comparable. Jacob's statement concerned how much he missed his mom and the negative effect that his father's murder of his mother has had on him personally. While Matthew would have testified that Appellant was generally a good father and a good provider, much of that testimony was cumulative to testimony elicited from other mitigation witnesses. This court has held that the omission of a witness when his or her testimony is cumulative does not deprive the defense of vital evidence. *Helton v. State*, 325 Ark. 140, 924 S.W.2d 239 (1996). Further, as the State points out, it could have impeached Matthew's testimony by introducing evidence that established the family was living in a shelter at the time of the murder and that the Department of Human Services had a case file on the family because of past issues.

Another issue to consider is what effect having only one child testify for Appellant could have had on the jury. In other words, would it have raised questions about the remaining children as to why none of them were willing to testify on their father's behalf. In *Rankin v. State,* 365 Ark. 255, 227 S.W.3d 924 (2006), we addressed the issue of a trial attorney's decision on whom to call as mitigating witnesses. In that case, the appellant would not allow his attorney to call his mother as a mitigation witness. Then, in his Rule 37 appeal, the appellant argued that his attorney had been ineffective in failing to present significant mitigation evidence. This court rejected the appellant's argument, noting that issues of an attorney's trial strategies or tactics were not to be debated in the Rule 37 forum. *Id.* Moreover, we noted that "calling only one relative, his aunt, as a witness would have been less than convincing, especially when immediate family members, such as his mother and brother, were not called to testify on his behalf." *Id.* at 260, 227 S.W.3d at 928. Like *Rankin,* the question arises of how compelling Matthew's testimony would have been in light of the number of other children Appellant had who did not testify on his behalf.

We simply cannot say that Appellant has demonstrated that there is a reasonable probability that the outcome of Appellant's sentencing would have been different had counsel interviewed and called Matthew as a witness. Looking at the totality of the evidence, we note that there were three aggravators found unanimously by the jury and affirmed by this court on direct appeal: (1) Appellant previously committed another felony, an element of which was the use or threat of violence to another; (2) in the commission of the capital murder, Appellant knowingly created a

great risk of death to other persons; and (3) the murder was committed in an especially cruel or depraved manner. At least one juror found four mitigating circumstances: (1) the murder was committed while Appellant was under extreme mental or emotional distress; (2) the murder was committed while Appellant was acting under unusual pressures or influences; (3) the murder was committed while Appellant's capacity to conform his conduct to the requirements of the law was impaired due to mental disease or defect, intoxication, or drug abuse; and (4) Appellant has six children and at least one of them has expressed a wish to get an answer as to why his father killed his mother. Despite the fact that the jury found four mitigating circumstances, including one that a child had expressed a desire to know why his father had killed his mother, the jury determined that the aggravating circumstances outweighed those mitigators and thus warranted a sentence of death. Accordingly, we find no error in the circuit court's denial of Appellant's petition on this ground.

## II. *Failure to Object to Prosecutor's Statements in Closing Argument*

As his second point, Appellant argues that counsel was ineffective in failing to object to statements by the prosecutor in closing argument of the penalty phase that Appellant claims were misleading on the issue of mitigation evidence. According to Appellant, the prosecutor's gross misstatements of the law of mitigation resulted in violations of the Eighth Amendment's protection against cruel and unusual punishment, as well as the Fourteenth Amendment's guarantees of due process. Appellant argues that his attorneys conceded that they failed to object to the statements, and Appellant asserts that this failure was prejudicial because there

is a reasonable probability that the statements could have had the effect of causing the jury to ignore significant mitigation evidence. The State counters that there is no merit to this argument as Appellant failed to raise this issue in the trial court and on direct appeal. Moreover, the State asserts that we found no prejudicial error in this regard during our mandatory review pursuant to Ark. R.App. P.-Crim. 10.

The circuit court, in denying relief, ruled that Appellant was required to raise a constitutional challenge at trial and on direct appeal. Moreover, the circuit court ruled that Appellant failed to demonstrate that he was prejudiced by counsel's failure to object.

Some of the statements by the prosecutor that Appellant now takes issue with include the following:

[M]itigating circumstances are factors you should take into consideration that lessen the culpability of the Defendant for what he has done; that make it less evil, for lack of a better word. . . .

Mitigating circumstances are special things that mitigate, that lessen culpability of the Defendant. If there is anguish in separation, it is sadly a common thing. That is not special to this Defendant and should not mitigate the horrific crime that he has committed.

. . . [I]t has to be something beyond the ordinary, something that lessens the accountability of the Defendant. The fact that he was a good welder 10 years ago, that is not a mitigating factor. The fact that 14 years ago he moved some furniture for someone, that is not a mitigating factor.

. . . [T]he fact that they performed well under community service, that is not a mitigating factor. The fact that they worked hard at Whirlpool, that is

not a mitigating factor. Those are things that we are expected to do, all of us. We are expected to work hard at our jobs. We are expected to be involved in our children's lives. We are expected to be civil to the people that we work and live around. Those aren't mitigating factor[s]. Those are what every single human being should do. The Defendant is asking for extra credit because he did it sometimes.

Appellant argues that these statements misled the jury because Arkansas neither defines nor limits mitigation by statute. And, in fact, he points to decisions by this court wherein the court has held that there is no requirement that the mitigating circumstances reduce culpability for the offense. *See Pickens v. State*, 292 Ark. 362, 730 S.W.2d 230 (1987) (holding that any relevant mitigating evidence concerning a defendant's character should not be excluded). He asserts that the prosecutor's remarks violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

■■■ First, the circuit court correctly noted that constitutional issues must be raised at trial and on direct appeal. Generally, a petition under Rule 37 does not provide a remedy when an issue could have been raised at trial or argued on appeal. *Howard*, 367 Ark. 18, 238 S.W.3d 24. There is, however, an exception to this general rule for errors that are so fundamental as to render the judgment of conviction void or subject to collateral attack. *E.g., Rowbottom v. State*, 341 Ark. 33, 13 S.W.3d 904 (2000) (double-jeopardy claim was a fundamental claim that appellant could raise for the first time in a Rule 37 proceeding); *Collins v. State*, 324 Ark. 322, 920 S.W.2d 846 (1996) (right to twelve-member jury is such a fundamental right that it could be raised for the first time in a Rule 37 proceeding); *Jeffers v.*

*State*, 301 Ark. 590, 591, 786 S.W.2d 114, 114 (1990) ("A ground sufficient to void a conviction must be one so basic that it renders the judgment a complete nullity; for example, a judgment obtained in a court lacking jurisdiction to try the accused."). Appellant's claim does not fit within such an exception; thus, we are limited to reviewing his claim that counsel was ineffective in failing to object to the prosecutor's statements.

■■ Joplin admitted at the Rule 37 hearing that he did not object to the prosecutor's remarks, but would do so now in a capital case. Despite his failure to object, however, Joplin discussed the jury's role with regard to mitigating circumstances in his own closing argument. He stated in relevant part that the jury was to consider mitigating circumstances, that those mitigating circumstances did not have to be proved beyond a reasonable doubt, and that mitigation is "anything that supports less than the ultimate punishment of death." And, notably, at least one juror found the existence of four mitigating circumstances. Even though Joplin admitted that he did not object to the prosecutor's remarks, or offer a strategic basis for his failure to object, Appellant has failed to demonstrate that he was prejudiced as a result. A petitioner asserting ineffective assistance of counsel has the burden of proving that the prejudice resulting from an alleged error was real and had some demonstrable, detrimental effect and not some abstract or theoretical effect. *Kelley v. State*, 2011 Ark. 504, 2011 WL 5995530. Because Appellant cannot satisfy the prejudice prong of *Strickland*, the circuit court was correct to deny relief on this claim.

III. *Failure to Object or Seek Instruction on Prior Felony Aggravator*

Next, Appellant argues that counsel was ineffective in failing to object to the State's

submission of an aggravator that Appellant had committed a prior violent felony by threatening to "cut" a jailer with a comb. Appellant asserts that there was insufficient evidence that the offense was a felony and, as such, counsel should have moved to dismiss this aggravating circumstance or, alternatively, should have requested a specific instruction as to whether the offense was a misdemeanor or a felony, as a specific felony was not identified at trial.[2]

The State counters that Appellant cannot challenge the sufficiency of the evidence underlying the aggravating circumstance because he challenged it on direct appeal. Moreover, the State asserts that Appellant cannot demonstrate prejudice with regard to this issue because this court, in the course of its Rule 10 review, determined that the aggravating circumstances were supported by sufficient evidence. Thus, according to the State, the fact that no reversible error occurred means that Appellant cannot show prejudice therefrom, even if he were to establish deficient performance by counsel.

On this issue, the circuit court denied relief, noting that Appellant had raised the issue of aggravating circumstances in his direct appeal to this court, and it was also the subject of a pretrial hearing. The circuit court then concluded that the testimony of Deputy Darren Scott that Appellant "grabbed the comb out of his hair and told me that he will fucking cut me" was evidence of a terroristic threat, as set forth in Ark.Code Ann. § 5–13–301, and the jury could have easily concluded as such. The circuit court concluded by noting that Appellant raised the issue prior to trial and the court determined the evidence was admissible.

At the Rule 37 hearing, Joplin testified that he recalled the State introducing evidence about a prior, uncharged felony incident wherein Appellant threatened to "cut" a jailer, and the instrument Appellant wielded was a comb that was never confiscated from Appellant. Joplin explained that he filed several motions with regard to the use of this felony but admitted that he did not ask for an instruction requiring the jury to first determine whether the incident was a felony or a misdemeanor, nor did he request that the jury be instructed to disregard the evidence if it determined the incident was a misdemeanor.

Insofar as Appellant's argument is a challenge to the sufficiency of the evidence, the State is correct that it cannot be properly raised in a Rule 37 proceeding. A petitioner cannot challenge the weight and sufficiency of the evidence through a Rule 37 proceeding by framing the question as an allegation of ineffective assistance of counsel. *Stephens v. State,* 293 Ark. 231, 737 S.W.2d 147 (1987). Moreover, a proceeding under Rule 37 does not allow an appellant the opportunity to reargue points that were decided on direct appeal. *Goodman v. State,* 2011 Ark. 438, 2011 WL 4840650 (per curiam). Here, although this court noted in the direct appeal that Appellant's counsel had not made a specific objection challenging the admissibility of the aggravating factors, we nonetheless reviewed, pursuant to Rule 10, the evidence supporting those aggravators and determined that they were supported by sufficient evidence. *Springs,* 368 Ark. 256, 244 S.W.3d 683.

We turn now to Appellant's contention that his counsel was ineffective in failing to request an instruction that

**2.** Prior to trial, when Appellant sought to exclude the aggravating circumstances, the

State identified this incident as the felony of terroristic threatening in the first degree.

required the jury to first determine whether the incident with the jailer was a felony or a misdemeanor. Joplin testified that he raised a pretrial challenge to the admissibility of the aggravators, albeit for a different reason. As stated, this court reviewed those aggravators and affirmed after determining that there was sufficient evidence supporting them. We cannot now conclude that Appellant's counsel was deficient in failing to seek an instruction that required the jury to determine whether the incident constituted a felony or a misdemeanor. Because there was sufficient evidence that it was a felony, any argument to the contrary by counsel would have been unavailing. Counsel is not ineffective for failing to make an argument that is meritless. *Montgomery v. State*, 2011 Ark. 462, 385 S.W.3d 189.

> Moreover, this court recently noted that to show prejudice under *Strickland* based on trial counsel's failure to request a specific instruction, the United States Supreme Court has held that an appellant must establish that it was "reasonably likely that the instruction would have made any difference [in the outcome of the trial] in light of all the other evidence of guilt." *Berghuis v. Thompkins*, —— U.S. ——, 130 S.Ct. 2250 [176 L.Ed.2d 1098] (2010).

*Strain v. State*, 2012 Ark. 42, at 8, —— S.W.3d ——, (per curiam). Here, the jury found that Appellant had committed a prior violent felony that constituted an aggravating circumstance. Appellant has provided nothing other than bare conjecture that an instruction requiring the jury to first determine whether the incident constituted a felony or a misdemeanor would have resulted in the jury finding that his threat to "cut" the jailer was a misdemeanor. In sum, Appellant has failed to demonstrate that his counsel's performance was deficient or that he suffered prejudice.

The circuit court correctly denied relief on this claim.

IV. *Failure to Object to Introduction of Written Victim–Impact Statements*

 Next, Appellant asserts that counsel was ineffective in failing to object to the introduction of written victim-impact statements. These statements, which were printed by the State and provided to Appellant's counsel prior to their admission, were read by the witnesses during the sentencing phase of the trial. According to Appellant, the statements were not admissible under any of the Rules of Evidence and had the impermissible effect of emphasizing those witnesses' testimony. The State argues that there is no merit to Appellant's argument on this point, as counsels' failure to object during trial was a strategic decision. Alternatively, the State asserts that this court previously addressed the issue of the evidence's admissibility and should not now revisit the issue under the guise of a Rule 37 challenge.

In ruling that Appellant was not entitled to relief on this claim, the circuit court noted that Joplin stated that he objected to the introduction of victim-impact evidence prior to trial. The court further noted that despite counsel's admission that he did not think to object to the written statements, Joplin admitted that it was preferable to have the witnesses read the statements that he had already seen.

While we do not agree with the State that this was a matter of trial strategy not subject to attack in a Rule 37 proceeding, we do agree that this allegation does not provide a basis for postconviction relief. There is a strong presumption that trial counsel's representation falls within the wide range of reasonable professional assistance. *Anderson*, 2011 Ark. 488, 385 S.W.3d 783. Appellant had the burden of

overcoming this presumption by identifying specific acts and omissions that, when viewed from counsel's perspective at the time of trial, could not have been the result of reasonable professional judgment. *Id.* Conclusory statements cannot be the basis of postconviction relief. *Id.* Here, Appellant has not sustained his burden, as his argument on this point is nothing more than a conclusory allegation that "the inclusion of the statements as exhibits had the effect of unfairly emphasizing the evidence." Accordingly, Appellant has not demonstrated that his counsel was ineffective or that he was prejudiced as a result.

### V. *Failing to Properly Conduct Voir Dire*

■ As his fifth allegation of error, Appellant asserts that counsel was ineffective in failing to conduct proper voir dire on the issue of racial bias. Appellant notes that he is African–American, that his wife was Caucasian, and the jury that was ultimately seated was all Caucasian. Thus, according to Appellant, because of the interracial nature of his relationship with the deceased, it was error for his trial counsel to not voir dire the jury on the issue of racial bias. The State counters that counsels' decision to not voir dire the jury on the issue of race was one of trial strategy that does not constitute deficient performance under *Strickland.* Moreover, the State argues that Appellant does not identify any juror who was biased and thus cannot show that he was prejudiced by counsels' failure to voir dire the jury on the issue of race.

The circuit court rejected this claim after distinguishing Appellant's case from that presented in *Turner v. Murray*, 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986). In *Turner*, the defendant asked the judge to inquire about racial bias and that request was denied, which the Su-

preme Court found to be erroneous. In this case, however, Appellant never asked and was never denied the right to inquire. Quoting *Turner*, the circuit court stated that "a defendant cannot complain of a judge's failure to question the venire on racial prejudice unless the Defendant has specifically requested such an inquiry." 476 U.S. at 37, 106 S.Ct. 1683. Moreover, the circuit court noted that this court has held that poor strategy in voir dire does not automatically result in ineffective assistance of counsel. The court also noted that the Appellant failed to show any actual bias on the part of some or all of the jurors. Finally, the court reasoned that Appellant's argument on this point ignored the State's overwhelming evidence of Appellant's guilt.

We agree with the circuit court that the instant case is distinguishable from *Turner*, as Appellant was never denied the right to inquire about racial bias. Moreover, this is not a situation where counsel ignored or was not aware of the potential for racial bias. Rather, the testimony from Joplin and Haaser indicated that they made a strategic decision not to inquire about racial issues so as to avoid sending the wrong message to the jury. Joplin admitted that he did not conduct any voir dire with regard to any possible racial bias or interracial issues, even though he was aware of the Supreme Court case of *Turner* that would have allowed him to do so. Joplin accepted fault for not giving the issue "meaningful consideration" but explained that he worried about making race an issue or giving the impression that Appellant "[wa]s trying to get off because he is black." He conceded that his failure to conduct voir dire on the issue was not an appropriate strategic decision because he did not give it enough meaningful consideration. He also stated that his co-counsel wanted to voir dire on the race issue, but that he overruled him.

Haaser stated that he recalled discussing whether to voir dire jurors on the issue of race and racial bias with Joplin and that they decided it would not be helpful to their client's defense. According to Haaser, Joplin feared that it would send the wrong message to the jury, specifically, that Appellant was looking for sympathy for the wrong reason. Haaser admitted that he disagreed with Joplin on this issue.

Even though Joplin admitted that he probably should have conducted some voir dire on this issue, it is clear that his choice not to do so was a strategic one. This is highlighted by his testimony, as well as the testimony of co-counsel Haaser. This court has repeatedly held that matters of trial strategy and tactics, even if arguably improvident, fall within the realm of counsel's professional judgment and are not grounds for a finding of ineffective assistance of counsel. *Williams v. State,* 2011 Ark. 489, 385 S.W.3d 228; *Noel v. State,* 342 Ark. 35, 26 S.W.3d 123 (2000). Thus, even though another attorney may have chosen a different course, trial strategy, even if it proves unsuccessful, is a matter of professional judgment. *Williams,* 2011 Ark. 489, 385 S.W.3d 228. Accordingly, we agree with the circuit court that Appellant was not entitled to relief based on this claim, as Appellant failed to demonstrate that his counsel was ineffective in this regard.

### VI. *Waiver of Right to Present Certain Mitigation Evidence*

Finally, Appellant argues that his purported waiver of his right to present evidence about the deceased was not knowing and intelligent, and counsels' failure to properly explain it to him resulted in ineffective assistance of counsel. Appellant asserts that the circuit court led him to believe that the information was not admissible when it clearly was and that such evidence would have explained some of the anguish that triggered his attack on the deceased. Appellant concludes that this lack of a knowing and intelligent waiver violated his due-process rights under the Fourteenth Amendment, as well as Article 2, Section 8's protection against cruel and unusual punishment. The State counters that character evidence about the deceased was not necessarily relevant and admissible at the penalty phase of Appellant's trial. But, according to the State, it is not necessary to delve into this issue because Appellant has failed to demonstrate any deficiency on the part of his trial counsel or any resulting prejudice that would afford him relief under *Strickland.*

In denying relief, the circuit court noted that counsel intended to call Melinda Temple, a neighbor of Appellant and Christina's, and when Appellant learned that she would testify to negative things about the deceased, he informed counsel that he was opposed to calling her. According to the circuit court, the trial court went into "quite some detail about the use of such evidence." Further, the circuit court noted that Appellant acknowledged that the evidence could help him, but that he did not "want to make my wife look bad."

At his Rule 37 hearing, Appellant testified that he wanted to prevent emotional testimony about the victim from being stated out loud in court and assumed the substance of the testimony would be presented to the jury in written form. Appellant's assertion at the Rule 37 hearing is not supported by the record from trial. At trial, Appellant's counsel attempted to call Temple as a witness. Thereafter, Joplin asked to approach the bench and told the court that Appellant had asked if the witness was going to "say bad stuff about Chrissy," and stated that he and Appellant had been back and forth on the issue, such

that counsel wished to make a record if his client persisted that he not call Temple. At that point, the trial court addressed Appellant directly and read a list of the potential witnesses and the derogatory testimony each would possibly give. The trial court then asked Appellant whether it was true that he did not wish to introduce any testimony relative to his wife being a bad person. Appellant responded that that was correct, that he did not wish to have such testimony introduced. This prompted the trial court to inquire whether Appellant understood he had a right to present mitigation evidence, including evidence about the victim, and Appellant reiterated his understanding and his desire not to introduce such evidence.

First, Appellant's argument that he did not make a knowing and intelligent waiver in violation of his constitutional rights, is not a proper Rule 37 claim, as allegations of trial error, even constitutional ones, are not grounds for postconviction relief. *Howard*, 367 Ark. 18, 238 S.W.3d 24. Finally, to the extent that Appellant's challenge is an assertion of ineffective assistance of counsel, it is without merit. In support of this claim, Appellant has presented nothing more than a conclusory allegation that counsel was ineffective in failing to properly inform him of the strength of his claim to present such evidence. As we have explained, conclusory statements cannot be the basis of postconviction relief. *Anderson*, 2011 Ark. 488, 385 S.W.3d 783. Accordingly, we cannot say that the circuit court erred in denying Appellant's request for relief on this ground.

Affirmed.